[No. 23974–1–I.   Division One.   May 6, 1991.]

THE STATE OF WASHINGTON, *Respondent,* v. BERTRAM ALEXANDER KEPIRO, *Appellant.*

*Jim Tweedie* and *Podrasky, Farris & Tweedie,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *John E. Bell* and *Allen Shabino, Deputies,* for respondent.

SCHOLFIELD, J.—Bertram Alexander Kepiro appeals his conviction under RCW 9A.72.160 on one count of intimidating a judge. We affirm.

## FACTS

On December 28, 1988, Kepiro was charged by information with intimidating a judge, contrary to RCW 9A.72.160. The charges were based on an allegedly threatening letter Kepiro sent to King County Superior Court Judge Terrence Carroll on November 25, 1988. Kepiro was found guilty of the charge following a jury trial in March 1989. The pertinent facts are as follows:

On November 12, 1987, Judge Carroll presided over a hearing in which Ellen Wilbur, a student at the University of Washington, requested and was granted an antiharassment order against Kepiro. Although Judge Carroll attempted to explain to Kepiro the significance of the order, Kepiro remained unsatisfied, believing he had a right to contact Wilbur. Shortly after the hearing, Kepiro contacted Judge Carroll's bailiff on at least two occasions to

complain that he didn't understand the order and that it was unfair. In December 1987, Kepiro wrote a letter to Judge Carroll regarding the order. Kepiro requested a definition of the term "contact" as it was used in the order and also requested information regarding the judge's "jurisdiction over the use of the U.S. Mail by a private citizen."

On January 4, 1988, Kepiro again wrote Judge Carroll, this time to request another hearing; in the letter Kepiro stated that his right to free speech, press and expression was being unconstitutionally violated. A second hearing before Judge Carroll was held shortly thereafter, following which Carroll orally affirmed the prior order. Nonetheless, Kepiro continued his communications to Judge Carroll. Kepiro sent Carroll flowers on Valentine's Day, as well as copies of letters he had apparently written to other people. One of the items received was a series of photocopies of a newspaper photograph of Judge Carroll; the photocopies gradually got larger and larger until only a photocopy of Carroll's head remained. Although he had no scheduled court appearances, Kepiro would occasionally sit in the back of Judge Carroll's courtroom. Believing the situation to be potentially serious, Judge Carroll contacted the police.

Seattle Police Sergeant George Marberg subsequently spoke to Kepiro regarding his communications with Judge Carroll. Kepiro smiled when told that Judge Carroll was concerned and uneasy about his behavior, and he admitted sending flowers to the judge. Kepiro stated that he had not been treated fairly by Judge Carroll, and that the judge had abused his rights. Kepiro was told to stay out of Judge Carroll's courtroom, and the matter was dropped.

Kepiro continued his communications, however, sending letters to Judge Carroll that were both strange and hostile in tone.[1] On November 25, 1988, Kepiro wrote the following letter to Judge Carroll:

---

[1]In one of the letters, Kepiro inquired whether Judge Carroll knew that his (Carroll's) daughter Ellen was born on May 23, 1963. The letter continued: "If I

Dear Judge Carroll,

Let us commemorate the date of November 30, 1988. This is the date that Bertram Alexander Kepiro is no longer obligated to kill in the name of the United States of America. . . . On this occasion it is befitting that he disseminate the knowledge of his nationally known and recognized skills to those who are the most deserving recipients of those skills.

Of all acknowledgements inherent to military skills, none is he more proud of than his marksmanship! At ranges of 200, 300 and 500 meters he proved he could complete the mission of the Marine Rifleman, which is to seek out, encounter and destroy the enemy by fire and maneuver. Of all persons he has had the benefit of learning the moral secrets contained in their hearts one stands tall above all others in deserving the totality of his marksmanship skills.

That person is Terrence A. Carroll. He shall be the recipient of Mr. Kepiro's outstanding Marksmanship skills. It is with great pleasure and satisfaction that you, Terrence A. Carroll, are hereby presented the badge earned by B. Alex Kepiro for expert marksmanship. With such it is hoped that you shall temper your decisions; as Mr. Kepiro has; in that with your license to kill you exercise great discretion on the side of mercy and compromise.

Long May You live, Judge Carroll,

B. Alex Kepiro.

Included with the letter was a sheet with copies of armed forces identification, as well as a marine badge with the inscription "Rifle Expert, 3rd award".

After receiving this letter, Judge Carroll once again contacted police. At the time, Kepiro was living in Boise, Idaho. On November 30, 1988, FBI agent George Sinclair contacted Kepiro to question him about the letter. Kepiro admitted that he sent the letter and stated that his purpose was to get the judge's attention, and make him "aware of

---

can get you removed for your misconduct, maybe I can get a truly honorable man to become Ellen's father. Is it standard procedure for judges to direct the falsification of court documents?" In another letter, dated November 4, 1988, and addressed to the "Honorless Terrence A. Carroll", Kepiro wrote:

Spoiled children develop attitudes like yours, and that is not beneficial to any government. If you've corrected your ways, you may gain my forgiveness. And if not, I hope someone shoots you in the head. Falsify [sic] transcripts from a court hearing should be punishable by death. You are corrupt, and what's worst [sic] you have corrupted others . . . to cover up your incompetence.

things he should be aware of." Kepiro denied any intent to threaten Judge Carroll.

Kepiro was charged with one count of intimidating a judge on December 28, 1988, and subsequently arrested. While incarcerated, Kepiro wrote Judge Carroll a letter of forgiveness. Following a jury trial in March 1989, Kepiro was convicted on the charges. This appeal timely followed.

## ACTUAL INTENT TO CAUSE HARM NOT AN ELEMENT
### OF INTIMIDATING A JUDGE
### UNDER RCW 9A.72.160

The crime of intimidating a judge is defined by RCW 9A.72.160 as follows:

> (1) A person is guilty of intimidating a judge if a person directs a threat to a judge because of a ruling or decision of the judge in any official proceeding, or if by use of a threat directed to a judge, a person attempts to influence a ruling or decision of the judge in any official proceeding.
> (2) "Threat" as used in this section means:
> (a) To communicate, directly or indirectly, the intent immediately to use force against any person who is present at the time; or
> (b) Threats as defined in RCW 9A.04.110(25).

In the present case, the jury was provided with the following definition of "threat" in instruction 5:

> Threat means to communicate, directly or indirectly, the intent:
> To cause bodily injury in the future to the person threatened or to any other person.

This instruction follows verbatim the language of RCW 9A.04.110(25)(a). In instruction 6, the jury was instructed as to the requisite mental element of the crime:

> It is not a defense to the charge of intimidating a judge either that the defendant did not actually intend to inflict bodily injury, or that he or she did not actually intend to cause alarm. The State must, however, prove that the defendant intentionally communicated the words that constitute the threat.

Kepiro first contends that the crime of intimidating a judge under RCW 9A.72.160 contains an implied element of intent to harm or reasonably cause alarm. Because instruction 6 expressly negated any such element of intent, Kepiro

maintains it was erroneous. We disagree and believe that the jury instructions, read as a whole, properly instruct the jury on the offense of intimidating a judge under RCW 9A.72.160.

RCW 9A.72.160 contains no requirement that the defendant actually intend to cause bodily harm to a judge. All that is required is that the defendant direct a threat to a judge in which he *communicates the intent* to do so. *See* RCW 9A.72.160; RCW 9A.04.110(25)(a) ("threat" defined). The question here is whether the court should imply a requirement of actual, subjective intent to cause harm where no such requirement is apparent in the statute.

As a general rule, criminal intent will not be inferred where the Legislature defines a crime as punishable by conduct alone. *State v. Elmore,* 54 Wn. App. 54, 771 P.2d 1192 (1989). There are two exceptions to this rule. The first is where a statute punishes conduct which may be innocent and is objectionable only if it is accompanied by a specific evil intent or guilty knowledge. The second exception is when there is some contrary legislative intent. *Elmore,* at 57.

For example, the court in *State v. Turner,* 78 Wn.2d 276, 474 P.2d 91, 41 A.L.R.3d 493 (1970) implied an element of intent under the Uniform Flag Law, former RCW 9.86.030. In that case, the court reversed Turner's conviction for flag desecration under former RCW 9.86.030 on the grounds that the State had not shown the requisite intent to commit the crime. *Turner,* at 284. The statute, former RCW 9.86.030, provided: "No person shall publicly mutilate, deface, defile, defy, trample upon or by word or act cast contempt upon any such flag, standard, color, ensign or shield." *Turner,* at 276. The court noted that the words of the statute—deface, defile, defy or cast contempt upon— strongly implied a requirement of evil intent or purpose. *Turner,* at 283. The court held that unless a statute expressly eliminates the element of intent or design or the offense was merely mala prohibita, the ingredients of design, intent or purpose were necessary for proof of guilt.

*Turner,* at 283. To hold otherwise, the court reasoned, would be to punish unintentional or accidental acts against the flag. *Turner,* at 283.

In the present case, Kepiro contends that the rationale of *Turner* is supportive of the conclusion that RCW 9A.72.160 carries an implied element of subjective or actual intent to cause harm. However, Kepiro's reliance on *Turner* here is misplaced for two reasons. First, the crime of intimidating a judge under RCW 9A.72.160 is carefully tailored so as not to punish conduct that may be innocent or accidental. Second, the elimination from the statute of any element of actual or subjective intent is supported by sound policy reasons.

In order to find a violation of RCW 9A.72.160, the trier of fact must find that the defendant directed a "threat" to a judge. In this case, the jury was properly instructed that "[t]hreat means to communicate, directly or indirectly, the intent [t]o cause bodily injury in the future to the person threatened . . .". Instruction 5. This instruction follows verbatim RCW 9A.04.110(25)(a), and is also consistent with the federal definition of the term "threat". *See United States v. Orozco–Santillan,* 903 F.2d 1262, 1265 (9th Cir. 1990) ("threat" is an expression of intention to inflict evil, injury, or damage on another). Communications which qualify as threats are outside the realm of protected speech, *State v. Brown,* 50 Wn. App. 405, 411, 748 P.2d 276 (1988), and one cannot innocently threaten to harm another person. Furthermore, any danger of accidental conduct being punished is eliminated by instructing the jury that the defendant must *intentionally* communicate the words constituting the threat, and such an instruction was given in this case. Instruction 6.

Nor do we believe that the Legislature intended RCW 9A.72.160 to carry an element of actual or subjective intent to cause harm. While RCW 9A.72.160 has not been construed in any appellate level decision in this state, a considerable body of case law has developed in the federal courts on whether, under statutes prohibiting the making of

threats against public officials, a showing of actual or subjective intent to carry out the threat is required. The cases are virtually unanimous in holding that no such intent is required. *See, e.g., Roy v. United States,* 416 F.2d 874 (9th Cir. 1969); *United States v. Mitchell,* 812 F.2d 1250 (9th Cir. 1987); *United States v. Orozco–Santillan, supra.*

The court in *Roy v. United States, supra,* concluded that actual intent to harm was not an element of the federal statute prohibiting threats against the President of the United States, 18 U.S.C. § 871.[2]

> [I]t appears that the statute was designed in part to prevent an evil other than assaults upon the President . . . .. It is our view that the other evil is the detrimental effect upon Presidential activity and movement that may result simply from a threat upon the President's life.
>
> . . . .
>
> If a threat is made in a context or under such circumstances wherein it appears that it is a serious threat, . . . then the threat would tend to have a restrictive effect upon the free exercise of Presidential responsibilities, *regardless of whether the person making the threat actually intends to assault the President and regardless of whether there is any actual danger to the President.* Thus, even though the maker of the threat does not have an actual intention to assault the President, an apparently serious threat may cause the mischief or evil toward which the statute was in part directed.

(Footnote omitted. Italics ours.) *Roy,* at 877. It is reasonable to conclude that a similar legislative intent motivated the Legislature to prohibit threats against judges under RCW 9A.72.160. We believe that the statute was designed in part to prevent the disruption of judicial activity which flows from the making of a threat, and such disruption clearly can result whether or not the maker of the threat has any intent to carry it out. For that reason, an actual or subjective intent to cause harm is not an element of the offense of intimidating a judge under RCW 9A.72.160.

---

[2]The statute provides, in relevant part: "Whoever knowingly and willfully deposits for conveyance in the mail . . . any letter . . . containing any threat to take the life of, . . . or to inflict bodily harm upon the President of the United States, . . . shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U.S.C. § 871(a).

■ Kepiro also contends that jury instruction 6 constituted an unconstitutional comment on the evidence. An instruction which does no more than accurately state the law pertaining to an issue in the case does not constitute an impermissible comment on the evidence by the trial judge under Const. art. 4, § 16. *State v. Ciskie*, 110 Wn.2d 263, 751 P.2d 1165 (1988). We conclude that the instruction accurately stated the law regarding the requisite intent under RCW 9A.72.160, and was not an impermissible comment on the evidence. The statute contains no requirement that a defendant actually intend to cause harm to a judge, and it was proper that the jury be so instructed.

### FEDERAL REQUIREMENT OF "TRUE" THREAT

■ At trial, the jury was provided with the definition of "threat" as contained in RCW 9A.04.110(25)(a). Kepiro contends that the giving of this instruction infringed upon his federally guaranteed First Amendment rights, as the definition lacks any requirement that the threat be a true or serious one. We disagree, and conclude that the definition of "threat" contained in the statute provides as much protection to constitutionally protected speech as does the federal definition of a true or serious threat.

In *Watts v. United States*, 394 U.S. 705, 22 L. Ed. 2d 664, 89 S. Ct. 1399 (1969), the Court construed the "threat" requirement of 18 U.S.C. § 871(a), a statute which prohibits threats against the President of the United States or his successors. Emphasizing that "[w]hat is a threat must be distinguished from what is constitutionally protected speech", the Court held that the government was required under the statute to prove a "true" threat, and that political hyperbole did not meet this definition. *Watts*, at 707. Since *Watts*, several federal courts have had the opportunity to define the term "true" threat:

> "[I]n order for the government to establish a 'true threat' it must demonstrate that the defendant made a statement
>> 'in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates a

statement as a serious expression of intention to inflict bodily harm upon or to take the life of [another individual].'" *United States v. Khorrami,* 895 F.2d 1186, 1192 (7th Cir. 1990) (quoting *United States v. Hoffman,* 806 F.2d 703, 707 (7th Cir. 1986)); *see also Roy v. United States, supra; United States v. Orozco–Santillan, supra* at 1265–66 ("true" threat is one where a reasonable person would foresee that the listener will believe he will be subjected to physical violence upon his person). A comparison of the federal definition of "true" threat with the definition of threat contained in RCW 9A.04.110(25)(a) reveals no significant differences in core substantive language:

> "Threat" means to communicate, directly or indirectly the intent:
> (a) To cause bodily injury in the future to the person threatened or to any other person; . . .

RCW 9A.04.110(25)(a). We believe that the two definitions carry the same basic meaning: to "threaten" means to communicate or express an intent to cause bodily injury to another. Furthermore, it is implicit in the definition of "threat" in RCW 9A.04.110(25)(a) that only true or serious threats are covered. The jury here was instructed that "[a] person acts with intent or intentionally when acting with the objective or purpose to accomplish a result which constitutes a crime." Instruction 7. We find it difficult to perceive how a communication of *intent* to cause future harm—a "threat" under RCW 9A.04.110(25)(a)—could reasonably be construed as anything but serious. We conclude that the communication directed by Kepiro in this case constituted a threat, and that it was made under circumstances in which a reasonable person would consider it serious.

Kepiro's further arguments warrant little discussion. As is made abundantly clear by federal case law and by our previous analysis, Kepiro's actual intent to carry out his threat is irrelevant and the jury was properly instructed to that effect in instruction 6. All that is required is that the defendant intentionally communicate the words which a

126

reasonable person would construe as a threat, and this requirement was clearly met here. The evil lies in the communication of the threat, regardless of whether the one making the threat intends to carry it out. Instructions 5 and 6 were not erroneous.

Judgment affirmed.

GROSSE, C.J., and PEKELIS, J., concur.